UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, A/S/O JASON V. YEONG, ET AL., | § § § § | |
| Plaintiff, | § § § | |
| and | § § | |
| FIRE INSURANCE EXCHANGE, A/S/O, RAYMOND LEHMKUHL, | § § § | |
| Intervenor, | § § | |
| v. | § § | CIVIL ACTION NO. 3:13-CV-946-B |
| INTERLINE BRANDS, INC., LINX, LTD., and WATTS PLUMBING TECHNOLOGIES (TAIZHOU) CO., LTD., | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

In this subrogation action, Allstate Insurance Company ("Allstate") and Fire Insurance Exchange ("Fire Insurance") (together, "Plaintiffs") allege that Defendant Watts Plumbing Technologies (Taizhou) Co., LTD ("Watts") manufactured defective toilet supply lines that caused water-related damage in a number of insured individuals' homes. Watts, which does business out of its sole facility in China, now moves to (among other things) dismiss the claims against it for lack of personal jurisdiction. Plaintiffs' primary response is that jurisdiction is proper under the stream of commerce doctrine. Because it finds that Plaintiffs fail to make out a *prima facie* case of personal

- 1 -

jurisdiction over Watts, the Court **GRANTS** the pending Motions to Dismiss for Lack of Personal

Jurisdiction (docs. 27, 43), and **DISMISSES WITHOUT PREJUDICE** the claims against

Defendant Watts.[1]

## I.

## BACKGROUND

This is a subrogation action removed from Texas state court on March 4, 2013. (Doc. 1,

Notice of Removal). Plaintiffs are the subrogees of thirteen insured homeowners residing in eight

different states, including three from Texas.[2] Over the course of a year-and-a-half (May 2011 to

September 2012), each insured homeowner allegedly sustained water-related property damage when

the plastic ballcock nut on one end of the toilet supply lines installed in their residences "cracked as

a result of a defect." (Doc. 24, Am. Compl. ¶¶ 9, 16.) The defective toilet supply lines—which share

mostly the same features and were sold under the "DuraPro" label—were allegedly manufactured by

Watts and sold to Defendant Linx, Ltd. ("Linx"), who re-sold the lines to Defendant Interline Brands,

Inc. ("Interline"), who then distributed the lines throughout the U.S. market, eventually ending up

in the insureds' residences. (*Id.* ¶ 9.)

While all three defendants deny liability, only Watts seeks dismissal at this time, primarily

---

[1] As such, the Court need not address Watts's other pending motions, including Motions to Dismiss for Failure to State a Claim and Motions for a More Definite Statement (docs. 27, 43). The Court declares these Motions to be **MOOT** in light of this Order's dismissal of the claims against Watts.

[2] The individuals (with the locations of their insured residences) include: Edde Smith (Texas), Betty D. Johnson (Maryland), Karen Kelly (California), Michael Goodwin (Louisiana), Jason V. Yeong (Texas), Dorothy Micklo (California), Neal Shipon (Pennsylvania), John Alvin Renee (Lousiana), Barry Lentnek (New York), Pamela O. Brucker (Maine), Jose Gallardo (Texas), Travis Justus (Arizona), and Raymond Luehmkuhl (California). Am. Compl. ¶ 2; Compl. in Intervention ¶ 8.

arguing that this Court lacks personal jurisdiction. Watts is a Chinese corporation that manufactures various plumbing products, which it sells to distributors and re-sellers (but not directly to consumers) in foreign and domestic markets. (*See* Doc. 27 Ex. 1, Aff. of Penngfei Zhao ("Zhao Aff."); Doc. 66, App. Supp. Pl.'s Resp. ("Pl.'s App.") at 372.) Since its inception in 2002,[3] Watts's "principal (and only) place of business" has been its manufacturing facility located on the eastern coast of China. (Zhao Aff. ¶ 2.)

The record reveals that Watts-manufactured products made their way into the United States in two relevant ways. First, various products originating from Watts's facility in China were shipped to businesses in the United States between 2003 and 2011, including fifty-four shipments to companies located in Texas. (Pl.'s App. 494-543.) Many of these shipments were made to Watts's parent company, Watts Regulator Co. ("Watts Regulator"), a separate and distinct entity also involved in the plumbing industry. (*See id.* at 372, 377, 494-543; Zhao Aff. ¶¶ 19, 22.) Though some contained toilet supply lines, none of these shipments are alleged to have contained the defective products at issue in this case.

Second, the record shows that over a two-and-a-half year period (February 18, 2003 to August 25, 2005) Watts-manufactured plumbing products—including 765,025 toilet supply lines like the ones at issue here—were shipped to a facility in Nashville, Tennessee. (Pl.'s App. 7-9.) That facility was a national distribution center owned by Interline, a publically-traded corporation based in the United

---

[3] Though Watts formerly operated under the name Taizhou Shida Plumbing Manufacturing Co., Ltd. ("Taizhou Shida"), the record shows that, at least for purposes of this Order, Watts and Taizhou Shida are functionally the same entities, simply operating under different names and slightly different ownership structures. (*See* Pl.'s App. 354, 357, 372, 377.) To avoid confusion, the Court simply refers to "Watts" whenever the record cites Taizhou Shida.

States that markets and distributes maintenance, repair, and operations products to customers in the United States and Canada. (*Id.* at 253, 269, 285, 297-98.) Before reaching Tennessee, the products were purchased by Linx—a small U.S.-based entity involved in (among other things) the resale of products offered by companies in China—pursuant to its "Import Supplier Partnership Agreement" with Interline, signed in 2002. (*Id.* at 157-58, 355-56.) Though Linx had never worked with Watts before 2002, it decided to do business with the Chinese manufacturer after learning of Watts's certificate of listing with IAPMO, Inc. ("IAPMO"), an association that certifies products for compliance with the Uniform Plumbing Code. (*Id.* at 169, 171-72, 229.) After Watts had IAPMO add Linx and Interline to the certificate of listing (*id.* at 126, 130), Interline began placing orders through Linx. More precisely, Interline sent purchase orders to Linx, who would then submit an identical order to Watts, and Watts, in turn, would fill the order and send it free-on-board ("F.O.B.") to Linx's facility in Shanghai, China. (*Id.* at 182-84; Zhao Aff. ¶ 23.) Linx then shipped the product to Interline's national distribution center in Nashville, Tennessee, from which the toilet supply lines could have gone on to any of the fifty to seventy-plus regional distribution centers Interline operated at this time. (*See, e.g., id.* at 260, 272, 304-05.) From there, Interline could have sold the DuraPro lines to any of the three customer bases it served—"facilities maintenance, professional contractors, and other distributors" (*Id.* at 253)—although Plaintiffs allege that the lines at issue here "made their way to store shelves, before they were installed in [the] insureds' residences." (Am. Compl. ¶ 17.)

On April 16, 2013, Watts filed four motions in response to Allstate's Amended Complaint (doc. 24), and later re-filed these same four motions in response to Fire Insurance's Complaint in Intervention (doc. 43). Watts subsequently withdrew one of its four pairs of motions (doc. 52)—its

Motion to Dismiss for Insufficient Service of Process—leaving the Court to resolve the following three pairs of outstanding motions: Motion to Dismiss for Lack of Personal Jurisdiction, Motion to Dismiss for Failure to State a Claim, and Motion for a More Definite Statement.

Briefing on these motions was delayed (docs. 34, 45) so that Magistrate Judge Ramirez could resolve Plaintiffs' Amended Motion for Leave to Conduct Jurisdictional and Claims Discovery (doc. 28). On October 3, 2013, Judge Ramirez issued an Order (doc. 58) denying Plaintiffs' discovery motion, finding that Plaintiffs had failed make a preliminary showing of personal jurisdiction. Plaintiffs objected to Judge Ramirez's Order, which this Court overruled on October 8, 2013 (doc. 62).

On October 25, 2013, Plaintiffs filed joint responses (docs. 65, 67, 68) to Watts's motions. Watts replied on November 8, 2013 (doc. 70), but only with respect to its Motion to Dismiss for Lack of Personal Jurisdiction. Along with its reply, Watts filed a Motion for Leave to File Appendix (doc. 72), which the Court now **DENIES** given that the Motion for Leave is opposed and Plaintiffs had no opportunity to respond to the new evidence presented in Watts's appendix (doc. 74). *See Springs Industries, Inc. v. American Motorists Insurance Co.*, 137 F.R.D. 238, 239-40 (N.D. Tex. 1991) ("The office of the reply brief . . . is to rebut the nonmovant's response . . . , not [to present] new supporting materials . . . [unless] no injustice is likely to result [and] the parties should agree [otherwise]."). Accordingly, the Court gives no consideration to Watts's reply appendix (doc. 74). Having reviewed the relevant filings and law, the Court is now prepared to issue its resolution.

## II.

## RULE 12(b)(2) LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of an action when a court lacks

personal jurisdiction over the defendant. In resolving a Rule 12(b)(2) motion, the Court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). Parties "seeking to invoke the power of the court bea[r] the burden of proving that jurisdiction [over the moving defendant] exists." *Luv n' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). But plaintiffs are not required to "establish jurisdiction by a preponderance of the evidence; a *prima facie* showing suffices." *Id.* at 469. Moreover, any factual conflict contained in the parties' submissions must be resolved in the plaintiff's favor. *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).

Two preconditions must be satisfied before this Court may assert personal jurisdiction: (1) the defendant must be amenable to service of process under Texas' long-arm statute; and (2) the assertion of jurisdiction over the defendant must comport with the Due Process Clause of the United States Constitution. *Jones v. Petty–Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992). Because Texas' long-arm statute has been held to extend to the limits of due process, only the second jurisdictional precondition must be examined. *Id.* at 1067-68 (citing, *inter alia*, *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990)). For personal jurisdiction to comport with due process, the plaintiff must show that: (1) the defendant purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state such that it would reasonably anticipate being haled into court there; and (2) exercising jurisdiction over the defendant would not offend traditional notions of fair play and substantial justice. *Id.* at 1068 (citations omitted).

The "minimum contacts" prong of the due process analysis can be met through contacts giving rise to either specific or general jurisdiction. *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*,

85 F.3d 201, 205 (5th Cir. 1996). "General personal jurisdiction is found when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial." *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999) (citation omitted). In contrast, specific personal jurisdiction is established through the defendant's contacts with the forum state arising from, or related to, the cause of action. *Gundle*, 85 F.3d at 205.

## III.

## ANALYSIS

Watts moves to dismiss the claims against it pursuant to Rule 12(b)(2) for lack of personal jurisdiction. Watts argues that the Court lacks specific personal jurisdiction because it did not purposefully direct any activities at Texas, do any business in Texas, "or otherwise have any contact with Texas." (Doc. 27, Mot. 8.) Similarly, Watts contends that general personal jurisdiction is improper because it has not had any, much less continuous and systematic, contacts with Texas. (*Id.*) Plaintiffs respond that the Court has both specific and general personal jurisdiction over Watts because of its commercial efforts to sell its products to businesses and consumer in Texas. (Doc. 65, Resp. 7-8.) The Court will examine, in turn, Plaintiffs' positions on specific and general personal jurisdiction to determine whether they have met their burden of establishing a *prima facie* case.

A.      *Specific Personal Jurisdiction*

The Fifth Circuit applies a three-step analysis to determine whether specific personal jurisdiction over a defendant exists:

> (1) whether the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Luv n' care v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Nuovo Pignone v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).

At step one, Plaintiffs rely on the stream-of-commerce test, which is typically invoked in cases in which "a nonresident defendant, acting *outside* the forum, places in the stream of commerce a product that ultimately causes harm *inside* the forum." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2855 (2011). In the Fifth Circuit, "'mere foreseeability or awareness'" that the accused product will reach the forum state's market is "'a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.'" *Ainsworth v. Moffett Engineering, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (quoting *Luv n' care*, 438 F.3d at 470). However, "the defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.* at 177 (citation omitted).

Despite Watts's citation to the holding in *J. McIntyre Machinery Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011) in its original brief, the Fifth Circuit recently found that *McIntyre* did not abrogate this Circuit's stream of commerce approach. More specifically, *Ainsworth* held first, that Justice Breyer's concurrence in *McIntrye*—rather than the more-broadly sweeping plurality—controlled, and second, that the concurrence "was explicitly based on Supreme Court precedent and on *McIntyre*'s specific facts," which involved a single sale in the forum state. *Id.* at 178-79. Though it noted Breyer's disapproval of a stream-of-commerce approach that would "subject a foreign defendant to jurisdiction so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states,'" the Fifth Circuit was "not

persuaded that" the facts presented in *Ainsworth* required it to "call upon such a broad power." *Id.* at 178-79 (quoting *McIntyre*, 131 S. Ct. at 2793 (Breyer, J., concurring) (emphasis in original)).

Having determined the relevant law, the Court turns now to the facts Plaintiffs offer in support. Plaintiffs primarily point to evidence that—between February 18, 2003 and August 25, 2005—765,025 Watts-manufactured toilet supply lines were shipped to Interline's national distribution center in Nashville, Tennessee. (*See* Pl.'s App. 7–9.) Plaintiffs also submit evidence showing that, around this time period: (i) Watts, Interline and Linx formed a distribution relationship, (ii) Interline had a broad distribution network in the United States and Canada with Texas commanding the second most regional distribution centers of any state, (iii) Texas was the second largest and most populous state in the Union, and (iv) Watts held a certificate of listing with IAPMO and requested to add Interline and Linx to that listing.[4] (Resp. 12-13, 19-24.) Plaintiffs maintain that these facts make this case no different than *Ainsworth* and other cases finding personal jurisdiction proper under the stream of commerce test.[5] (*Id.* at 13-19.) The Court disagrees and finds that Plaintiff fall short of making out a *prima facie* case under the stream-of-commerce test.

---

[4] While Plaintiffs also point to statements made by the parent company of Watts' parent company (Watts Water Technologies, Inc.) (Resp. 22), these statements deserve no consideration. Aside from the fact that they offer no real substance to Plaintiffs' case, a parent company's actions cannot attributed to the subsidiary where the "parent and subsidiary maintain separate and distinct corporate entities" and there is no "proof of control by the parent" that would allow the Court to "fuse the two for jurisdictional purposes." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 856 (5th Cir. 2000). Defendants show that Watts and Watts Water Technologies, Inc. are separate and distinct entities (Zhao Aff. ¶ 22), which Plaintiffs do not rebut. And since there is no proof of Watts being controlled by its parent company (Watts Regulator), much less its parent's parent company, the statements of Watts Water Technologies must not be considered.

[5] The other three cases Plaintiffs compare these circumstances to include: *Giotis v. Apollo of the Ozarks, Inc.*, 800 F. 2d 660 (7th Cir. 1986); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F. 3d 610 (8th Cir. 1994); *Willemsen v. Ivacare Corp.*, 282 P.3d 867 (Or. 2012) (en banc). Note that, while the Court considers these three cases for their persuasive value, only *Ainsworth* is binding.

Plaintiffs are correct that this case shares some similarities with *Ainsworth*. In both instances, a foreign manufacturer-defendant—Watts from China (here), Moffett from Ireland (*Ainsworth*)—sold a relatively large quantity of the accused product—765,025 toilet supply lines (here), 13,073 forklifts (*Ainsworth*)—to a distributor with a broad network in the United States—Interline (here), Cargotec (*Ainsworth*)—and connections to a forum state that has a relatively large number of potential consumers of that product—second most households in Texas (here), fourth most poultry-producers in Mississippi (*Ainsworth*). But while Plaintiffs essentially base their case on these general facts, the plaintiff in *Ainsworth* went much further, showing the precise contacts Moffett had in the forum state (203 forklifts sold in Mississippi), the exact benefit it derived from its forum-related contacts (1.55% of Moffett's total sales made in Mississippi), and a close ten-year relationship between the Moffett and its distributor, including an agreement that gave Cargotec exclusive rights to distribute Moffett's products in the United States and a common parent company between the two wholly-owned subsidiaries. *Ainsworth*, 716 F.3d at 175 & n.2, 179. Even though Moffett claimed to have no knowledge of any sales in Mississippi, these concrete facts allowed the court to infer that "Moffett could have 'reasonably anticipated' being haled into court in Mississippi."[6] *Id.* at 179. This conclusion was consistent with the Fifth Circuit's long-standing position that "[w]here a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amendable to suit in that state." *Luv n' Care*, 438 F.3d at 470.

---

[6] Similarly, in another case Plaintiffs rely on, the Eighth Circuit reasoned that, even though defendants claimed to "ha[ve] no actual knowledge" of their products being sold in the forum state, "such ignorance defie[d] reason and could aptly be labeled wilful" in light of the wealth of circumstantial proof. *Baron*, 25 F.3d at 613.

In this case, the Court cannot reasonably infer, from the minimal relevant facts Plaintiffs present, that Watts knowingly benefitted from the Texas market in the sale of its toilet supply lines. For starters, there is no direct proof or allegations that any of Watts's toilet supply lines were ever purchased in Texas, which is arguably reason enough to find jurisdiction lacking.[7] In fact, the Amended Complaint—at best—merely implies that the toilet supply lines ended up in three Texas homes: the three insured individuals (of thirteen in total) with residences in Texas. Allegations of three products making it into the forum state is a far cry from the concrete proof of 203 forklifts in *Ainsworth*.[8] Likewise, Plaintiffs altogether fail to indicate what benefit, if any, Watts may have derived from the supposed forum-related sales.

In addition, the Court has no reasonable basis to conclude that Watts was aware of, or could reasonably foresee, its product being sold in Texas. On top of the deficiencies noted above, the record does not demonstrate a close relationship between manufacturer and distributor that would suggest an understanding of each side's activities. Instead, unlike any of the cases Plaintiffs rely on,[9] the evidence shows that Watts was indirectly linked to Interline, just one of its known distributors, for only two-and-a-half years. This indirect relationship is made weaker by the fact that it started in China, where Watts carried out the entirety of its end of the deal, filling the orders Linx relayed from Interline

---

[7] *See Bluestone Innovations Texas, LLC v. Formosa Epitaxy, Inc.*, 822 F. Supp. 2d 657, 663 (E.D. Tex. 2011) (finding no specific personal jurisdiction under the stream of commerce test due to a lack of any "direct evidence that [the] accused products were ever actually sold in the State of Texas").

[8] In another case Plaintiffs cite, "the record show[ed] that, over a two-year period, [a third party] sold motorized wheelchairs with [defendant's] CTE battery charges in" the forum state. *Willemsen*, 352 Or. at 203.

[9] *See, e.g.*, *Giotis*, 800 F. 2d at 668 ("There is no evidence that the defendants were unaware of this scope of [the distributor's] sales efforts, and in fact [one defendant] admits that" it was aware of its distributors' "capabilities").

and shipping the requested product F.O.B. to Linx's facility in Shanghai. *See* (Zhao Aff. ¶ 23; Pl.'s

App. 166-68, 182-85); *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir. 1987) ("This contact was

weakened even further by the fact that the sale was initiated by the buyer and was shipped F.O.B.

California, the [defendant's] place of business."). In short, there is no indication that Watts had any

knowledge as to where in Interline's broad network its toilet supply lines *might* end up after handing

the product off to Linx. Thus, unlike in *Ainsworth*, asserting jurisdiction in this case would require the

overly "broad power" criticized by Justice Breyer's concurrence in *McIntyre*. *See Ainsworth*, 716 F.3d at

178-79.

Essentially conceding these shortcomings, Plaintiffs posit that "it is reasonable to assume" a

significant number of toilet supply lines were sold in Texas based on the large quantity of product

shipped to Tennessee, Interline's high percentage of plumbing-related sales, and Interline's relatively

strong presence in Texas. (Resp. 21.) Even drawing all reasonable inferences in their favor,[10] the Court

disagrees with Plaintiffs that this assumption is reasonable in these circumstances.

To illustrate, there is no indication that Interline simply divvied up the toilet supply lines it

received at its national distribution center among the regional distribution centers Interline had spread

out across the United States and Canada. Rather, through its inventory management system, Interline

could have directed the DuraPro toilet supply lines in bulk to certain states and only randomly to

others based on the product's demand (*see, e.g.,* Pl.'s App. 260-61; 304-05), which may have varied

---

[10] Note that the percentage of plumbing products sold by Interline is irrelevant to the question of whether toilet supply lines were sold in Texas, so this fact deserves no inference at all. And the number of regional distribution centers in Texas Plaintiffs cite is somewhat misleading, because this fact simply reflects Texas's size, not some sort of favoritism on the part of Interline.

across states for reasons such as differing product certification requirements.[11] To further complicate matters, even if a significant quantity of toilet supply lines made it to regional distribution centers in Texas, they still could have ended up with out-of-state consumers since Interline's customers are mostly middlemen, including "professional contractors" and "other distributors." (Pl.'s App. 253.) In fact, Plaintiffs allege that the lines made it to "store shelves" before reaching the insureds' residences. (Am. Compl. ¶ 17). With all the unaccounted-for variables in this long chain of distribution, the Court cannot reasonably assume enough DuraPro lines reached Texas consumers to qualify as more than random or fortuitous contacts. And even if it could, this long and uncertain distribution chain makes it even more unlikely that Watts could have reasonably foresaw its product reaching Texas consumers.

Lastly, Plaintiffs maintain that Watts's "concerted effort to certify its plumbing products with IAPMO" shows Watts could have reasonably anticipated being haled into court in Texas. (Resp. 23.) But Plaintiffs provide no direct evidence of Watts's motivations to initially acquire its IAPMO certification, and instead rely solely on an IAPMO representative's "opinion" on why a company would generally seek such a certification. (*Id.* at 23-24.) More importantly, there is no evidence that Watts's relationship with Interline and Linx was part of some concerted effort to reach the U.S. or Texas markets. On the contrary, the record shows that Linx and Interline approached Watts in China, that Interline drove how much product ultimately made it to the United States through the variable orders it placed, and that Watts simply filled the orders relayed to it by Linx before shipping the product F.O.B. to Linx's Shanghai facility.

---

[11] *See* Pl.'s App. 227 (IAMPO representative testifying that "many jurisdictions"—meaning for example, a "[p]ublic inspector at a city or county, any region"—"require third-party certification through an agency such as [IAMPO], and by obtaining a certification, it facilitates the acceptance of their product within the given jurisdiction").

In sum, there is insufficient evidence for the Court to conclude that Watts "delivered [its toilet supply lines] into the stream of commerce with the expectation that it would be purchased by or used by consumers in [Texas]." *Ainsworth*, 716 F.3d at 177 (quotation marks and citation omitted). Accordingly, the Court finds that Plaintiffs failed to make out a *prima facie* case of specific personal jurisdiction over Watts.

      B.      *General Personal Jurisdiction*

Plaintiffs next contend that general personal jurisdiction over Watts is proper because of the large quantity of product it shipped to Texas. (Resp. 8.) Specifically, Plaintiffs' evidence shows that from 2003 to 2011 "Watts made fifty-four shipments . . . to companies located in the State of Texas." (*Id.* at 25.) The evidence further indicates that these shipments weighed nearly 2,000,000 pounds in total and often included the description "Flexible Water Connectors." (Pl.'s App. 488-543.) This evidence, according to Plaintiffs, establishes that "Watts has maintained continuous and systematic business contacts with this state by shipping millions of products into Texas on a regular basis." (Resp. 25.) This conclusion is completely unsupported by precedent.

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 131 S. Ct. at 2851 (2011) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945). This test "'is a difficult one to meet, requiring extensive contacts between a defendant and a forum.'" *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609-10 (5th Cir. 2008) (quoting *Submersible Sys., Inc. v. Perforadora Cent., S.A.*, 249 F.3d 413, 419 (5th Cir.2001)).

- 14 -

Here, Watts's fifty-four shipments of products to Texas over an eight-year period—equating to less than seven annual shipments—does not qualify as "continuous and systematic" forum contacts for purposes of general personal jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418, 104 S. Ct. 1868, 1874, 80 L. Ed. 2d 404 (1984) ("[M]ere purchases [in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general personal] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."). Simply put, this limited and discrete business Watts conducted does not render the Chinese manufacturer "essentially at home" in this forum. *Goodyear*, 131 S. Ct. at 2856-57; *see also Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 560 (5th Cir. 2013) (finding no general personal jurisdiction where defendants, "although sustained over an appreciable period, transacted only limited and discrete business" in the forum state). Thus, the Court finds that Plaintiffs' failed to make out a *prima facie* case of general personal jurisdiction over Watts.

In conclusion, Plaintiffs failed to establish Watts's "minimum contacts" with Texas under either the specific or general personal jurisdiction theories. Exercising personal jurisdiction over Watts under these circumstances would violate Due Process. As such, the Court **GRANTS** Watts's Motions to Dismiss for Lack of Personal Jurisdiction and **DISMISSES** all claims in this matter against Watts.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant Watts Plumbing Technologies (Taizhou) Co., Ltd.'s Motions to Dismiss for Lack of Personal Jurisdiction (docs. 27, 43) and **DISMISSES WITHOUT PREJUDICE** all claims against Watts in both the First Amended

Complaint (doc. 24) and the Complaint in Intervention (doc. 17). In light of its ruling, the Court

finds Watts's Motions to Dismiss for Failure to State a Claim and Motions for a More Definite

Statement (docs. 27, 43) to be **MOOT**.

      SO ORDERED.

      SIGNED: February 5, 2014.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE